Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 24, 2018
AS MODIFIED OCTOBER 15, 2018

**2018 CO 78M**

**No. 15SC292, <u>Casillas v. People</u> — Evidence — Searches and Seizures — Exclusionary Rule.**

In this criminal appeal, the supreme court reviews whether the exclusionary rule requires the suppression of evidence derived from a juvenile probation officer's unauthorized collection of DNA from a juvenile in violation of section 19.2.925.6, C.R.S. (2018) and the Fourth Amendment. The supreme court holds that juvenile probation officers are properly considered adjuncts to law enforcement; the officer's collection of the juvenile's DNA for uploading to CODIS served an inherent law enforcement function; nothing in the record suggests the officer conducted the buccal swab search in reliance on misinformation provided by a third party; and the unlawful search here was not based on a reasonable misinterpretation of the law. Because suppression would have a deterrent effect by removing incentives to collect DNA from ineligible juvenile offenders, the supreme court holds that suppression is warranted. Accordingly, the court reverses the judgment of the court of appeals and remands the case with instructions to vacate petitioner's conviction.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 78M

**Supreme Court Case No. 15SC292**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 12CA703

**Petitioner:**

Ismael Casillas,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Reversed.**
*en banc*
September 24, 2018

Opinion modified, and as modified, petition for rehearing DENIED. EN BANC.

October 15, 2018

**Attorneys for Petitioner:**
Megan Ring, Public Defender
M. Shelby Deeney, Deputy Public Defender
    *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
L. Andrew Cooper, Deputy Attorney General
    *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE SAMOUR** dissents.
**JUSTICE GABRIEL** does not participate.

¶1 Colorado law requires certain juvenile offenders to submit to collection of their DNA for testing. § 19-2-925.6(1), C.R.S. (2018). However, this requirement "shall not apply to an offender granted a deferred adjudication, unless otherwise required to submit to a sample pursuant to [section 19-2-925.6] or unless the deferred adjudication is revoked and a sentence is imposed." § 19-2-925.6(1)(e).

¶2 In 2008, a juvenile probation officer swabbed the cheek of Petitioner Ismael Casillas, then a juvenile, to collect a DNA sample. The probation officer's collection of Casillas's DNA violated section 19-2-925.6(1) because Casillas had been granted a one-year deferred adjudication and he was not otherwise required under the statute to submit a DNA sample. His genetic markers were nevertheless uploaded to the federal Combined DNA Index System (CODIS).

¶3 Several months after Casillas successfully completed the terms of his deferred adjudication and his juvenile case had been dismissed, law enforcement investigators matched DNA evidence recovered from a stolen vehicle with the sample in the CODIS database taken from Casillas during his juvenile deferred adjudication. As a result of the DNA match, Casillas was identified and charged in connection with a carjacking.

¶4 Before trial, Casillas moved to suppress all evidence derived from the DNA match, arguing that evidence derived from the unauthorized cheek swab should be excluded as the fruits of an unlawful search in violation of his Fourth Amendment rights. The trial court denied the motion, and a jury later convicted Casillas of criminal mischief.

¶5     Casillas challenged the trial court's suppression ruling on appeal. In a published, split ruling, the court of appeals affirmed Casillas's conviction. People v. Casillas, 2015 COA 15, __ P.3d __. The division unanimously held that the cheek swab violated both the juvenile DNA collection statute and the Fourth Amendment. See id. at ¶¶ 3, 18, 22, 41. The majority held that suppression was nevertheless unwarranted because the officer who performed the cheek swab was "performing nothing more than a supervisory function under the direction of the juvenile court," and therefore, suppression "would have no deterrent value." Id. at ¶ 38. Judge Webb dissented, concluding that Casillas's motion to suppress should have been granted. Id. at ¶¶ 42, 54 (Webb, J., dissenting).

¶6     We granted Casillas's petition for a writ of certiorari to review whether the exclusionary rule requires suppression of the evidence derived from the juvenile probation officer's unauthorized collection of Casillas's DNA in this case.[1] We conclude that it does. Accordingly, we reverse and remand with instructions to vacate Casillas's conviction.

---

[1] We granted certiorari to review the following issues:

1. Whether the court of appeals erred when it concluded that an unreasonable search by a juvenile probation officer does not require the application of the exclusionary rule.

2. Whether taking evidence in violation of the applicable statute requires suppression of that evidence.

4

## I. Facts and Procedural History

¶7     In June 2008, Petitioner Ismael Casillas, then a juvenile, entered into a stipulated, one-year deferred adjudication for drug possession. The stipulation required him to be under the supervision of the juvenile probation department. Soon thereafter, a juvenile probation officer subjected Casillas to a buccal swab (commonly referred to as a "cheek swab")[2] and entered his genetic markers into CODIS.[3] Why the officer took the swab remains unknown; nothing in the record sheds light on his reasons for doing so. Casillas eventually successfully completed the terms of his deferred adjudication, and his case was dismissed with prejudice in May 2009.

¶8     Several months later, three young men ambushed an older man and stole his car. Within hours, the victim's car was found wrecked. A crime scene investigator discovered blood stains on the inside of the front passenger door, and the police submitted samples of this blood evidence to the Colorado Bureau of Investigation (CBI) for testing against

---

[2] A buccal swab is a method of gathering DNA that typically involves rubbing a cotton swab inside a subject's mouth against the interior of his or her cheek.

[3] The federal Combined DNA Index System—CODIS, for short—is a set of databases available to law enforcement agencies across the country for law enforcement purposes. See Frequently Asked Questions on CODIS and NDIS, Fed. Bureau of Investigation, https://perma.cc/C97H-Q58M. Using CODIS, law enforcement officers can compare crime scene evidence to a database of DNA profiles obtained from convicted offenders. Id. CODIS can also be used to link DNA evidence obtained from different crime scenes, thereby identifying serial criminals. Id.

DNA profiles in CODIS. This testing revealed that the blood evidence found in the car matched the profile for Casillas.

¶9 In the process of comparing the blood evidence against profiles in CODIS, a CODIS administrator for the CBI learned that Casillas had not been eligible for DNA testing. The CODIS administrator nevertheless informed the detective who was investigating the carjacking of the match, noting that Casillas's DNA had been collected for previous offenses that did not qualify for CODIS entry. Based on the CODIS match, the detective proceeded to include Casillas in a photo array presented to the carjacking victim. The victim identified Casillas in the photo array as one of his assailants. As a result, Casillas was arrested and charged with aggravated robbery and menacing.

¶10 Before trial, Casillas moved to suppress the DNA and photo array identification, arguing that the collection of his DNA and uploading of his genetic markers to CODIS was statutorily unauthorized and violated his Fourth Amendment rights. At the suppression hearing, Casillas presented email correspondence showing that, when the blood evidence from the stolen car was matched with his DNA profile in CODIS, the CBI's CODIS administrator realized that Casillas's DNA profile had been improperly uploaded into the system. The CODIS administrator contacted a probation analyst with the State Court Administrator's Office to confirm, writing: "It looks like I have another CODIS hit to an offender with a deferred sentence . . . . It looks like he was not eligible, but I need you to confirm that." The probation analyst responded, confirming that Casillas was a juvenile "under a deferred adjudication for . . . a felony drug charge," that

6

he "successfully completed his deferred adjudication," and that Casillas therefore was "not eligible for DNA testing on this case." Casillas also presented records reflecting that the detective who included Casillas in the photo array based on the DNA match knew that the match was based on a "non-qualifying offense submission." Records admitted at the suppression hearing further showed that, the same day the CODIS administrator disclosed the match to the detective, Casillas's DNA profile was expunged from the CODIS database, apparently at the request of the probation analyst from the State Court Administrator's Office. The juvenile probation officer who took Casillas's cheek swab did not testify.

¶11 Casillas argued that the buccal swab conducted by the juvenile probation officer was an unlawful search under the Fourth Amendment, and that both the DNA identification and photo-array identification should be excluded as fruits of an unlawful search and seizure of his genetic markers. The People conceded that the collection of Casillas's DNA was not authorized under section 19-2-925.6, but argued that suppression was unwarranted as a remedy for the statutory violation. In so doing, the People did not contend that the probation officer took the cheek swab as the result of a good faith mistake of fact or law. See § 16-3-308, C.R.S. (2018) (permitting proponent of evidence to argue that evidence seized by a peace officer was the result of a "good faith mistake" or "technical violation" and thus should not be suppressed). Instead, the People argued that the buccal swab was justified under the "special needs" exception to the warrant

7

requirement under the Fourth Amendment, citing People v. Shreck, 107 P.3d 1048, 1052 (Colo. App. 2004).

¶12    The trial court denied Casillas's motion. In its written order, the court noted that it was not given a copy of the order placing Casillas on a deferred adjudication, and inaccurately described Casillas as having been "placed on probation." From this mistaken factual premise, the court reasoned that the cheek swab did not violate the juvenile DNA collection statute because section 19-2-925.6(1)(e)(III) indicates that a sample may be taken from a juvenile felony offender who is "sentenced to probation." The trial court further reasoned that, even if the search was not statutorily authorized, suppression was unwarranted because there was no evidence of willful or recurring violation of the statute. The court also agreed with the People that the search was justified under the special needs exception to the warrant requirement, and therefore did not violate the Fourth Amendment. At trial, a jury ultimately convicted Casillas of criminal mischief (a lesser non-included offense) but acquitted him of all other counts. The court sentenced Casillas to six years of probation.

¶13    In a divided opinion, the court of appeals affirmed the trial court's suppression ruling, but on different grounds. People v. Casillas, 2015 COA 15, ¶ 41, __ P.3d __. The division unanimously held that Casillas's cheek swab violated the juvenile DNA collection statute because: (1) it was undisputed that the juvenile court had granted Casillas a deferred adjudication; (2) he was not required to submit a DNA sample under another section of the juvenile DNA collection statute; and (3) he had successfully

8

completed his deferred adjudication. See id. at ¶¶ 3, 18, 41. It also unanimously held that the cheek swab was an unreasonable search under the Fourth Amendment. See id. at ¶¶ 22, 41. The division majority held that suppression was nevertheless unwarranted because the officer who performed the cheek swab was "performing nothing more than a supervisory function under the direction of the juvenile court," and therefore, suppression "would have no deterrent value." Id. at ¶¶ 38, 41. Accordingly, the division majority affirmed Casillas's conviction. Id. at ¶¶ 3, 41.

¶14 Judge Webb dissented, disagreeing with the majority's assertion that a juvenile probation officer performs a merely supervisory function for the juvenile court and instead reasoning that juvenile probation officers have broad law enforcement powers. Id. at ¶¶ 43–44 (Webb, J., dissenting). He argued that juvenile probation officers have a stake in law enforcement activities because they provide information for arrest warrants, execute arrest warrants, take suspects into temporary custody, and otherwise enforce the laws of the state. Id. at ¶ 47. He also noted that the prosecution could have, but did not, invoke the statutory "good faith mistake" exception under section 16-3-308, and thus, any lack of explanation in the record regarding the probation officer's reason for taking the cheek swab weighs in favor of—not against—suppression. Id. at ¶¶ 51–52. Because suppression would deter future violations, Judge Webb concluded, Casillas's motion to suppress should have been granted. Id. at ¶¶ 50–54.

¶15 We granted Casillas's petition for a writ of certiorari to review the court of appeals' opinion. The People did not file a cross-petition to challenge the court of appeals'

conclusions that Casillas's cheek swab violated the juvenile DNA collection statute and the Fourth Amendment.

## II. Analysis

¶16 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" for purposes of the Fourth Amendment. Maryland v. King, 569 U.S. 435, 446 (2013).

¶17 Here, the court of appeals unanimously concluded that Casillas's cheek swab violated both the juvenile DNA collection statute and the Fourth Amendment. The People do not challenge these conclusions. Thus, the sole question is whether the evidence derived from the unauthorized cheek swab should be suppressed.

### A. Standard of Review

¶18 When reviewing a lower court's ruling on a suppression motion, this court is presented with mixed issues of law and fact. People v. Martin, 222 P.3d 331, 334 (Colo. 2010). Where sufficient evidence exists in the record to support a trial court's findings of fact, we defer to those findings. People v. Kutlak, 2016 CO 1, ¶ 13, 364 P.3d 199, 203. But the trial court's conclusions of law—i.e., the legal effect of those factual findings—we review de novo. See id.

### B. Exclusionary Rule

¶19 "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands. . . ." United States v. Leon, 468 U.S. 897,

10

906 (1984). Nonetheless, to effectuate the Fourth Amendment's guarantee against unreasonable searches and seizures, the Supreme Court developed the exclusionary rule. Illinois v. Krull, 480 U.S. 340, 347 (1987) (citing United States v. Calandra, 414 U.S. 338, 348 (1974)). When applicable, the exclusionary rule "forbids the use of improperly obtained evidence at trial," Herring v. United States, 555 U.S. 135, 139 (2009), as well as "evidence later discovered and found to be derivative of an illegality," Utah v. Strieff, __ U.S. __,136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). The rule, which operates as a judicially created remedy, seeks to safeguard Fourth Amendment rights generally through the rule's deterrent effect. Leon, 468 U.S. at 906.

¶20 Recently, this court has used language suggesting that exclusion necessarily follows from an unlawful search. See, e.g., People v. Zuniga, 2016 CO 52, ¶ 14, 372 P.3d 1052, 1057 ("If a warrantless search violates the Fourth Amendment . . . then the remedy is suppression of the evidence obtained."); People v. Ackerman, 2015 CO 27, ¶ 12, 346 P.3d 61, 65 ("If a [search] violates the Fourth Amendment, then its results constitute fruit of the poisonous tree and must be suppressed based on the exclusionary rule.").

¶21 However, "the exclusionary rule should not automatically apply every time a Fourth Amendment violation is found. . . ." People v. Gutierrez, 222 P.3d 925, 941 (Colo. 2009). Because "the exclusionary rule is intended to deter improper police conduct[,]" it "should not be applied in cases where the deterrence purpose is not served, or where the benefits associated with the rule are minimal in comparison to the costs associated with

11

the exclusion of probative evidence." People v. Altman, 960 P.2d 1164, 1168 (Colo. 1998) (internal quotation marks omitted); see also Davis v. United States, 564 U.S. 229, 237 (2011) (noting that the rule's operation is limited to situations in which its deterrent purpose is served); Herring, 555 U.S. at 141 (holding that "the benefits of deterrence must outweigh" the heavy costs of excluding reliable and trustworthy evidence bearing on guilt or innocence).

¶22 Because the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," to warrant its application, law enforcement conduct must be "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 144. The pertinent analysis of deterrence and culpability is objective and does not inquire into an officer's subjective intent. Id. at 145. Rather, the inquiry is "'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Id. (quoting Leon, 468 U.S. at 922 n.23). Evidence should be suppressed, for example, where "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Krull, 480 U.S. at 348–49 (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

## C. Suppression Is Warranted Here

¶23    The People note that the U.S. Supreme Court has held that suppression is generally inappropriate where the Fourth Amendment violation results not from police misconduct, but instead from an error within the judicial branch.  In Leon, for example, the Court rejected suppression as a remedy where officers acted in reasonable reliance on a search warrant that was issued by a neutral magistrate but was later found to be unsupported by probable cause.  468 U.S. at 900, 913, 922.  The Court reasoned that the exclusionary rule is "designed to deter police misconduct rather than to punish the errors of judges and magistrates."  Id. at 916; see also Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984) (rejecting suppression where search warrant was invalid but "it was the judge, not the police officers, who made the critical mistake").  Similarly, in Arizona v. Evans, 514 U.S. 1, 14 (1995), the Court held that suppression was not warranted where an officer's unlawful seizure stemmed from a mistake by court employees.  There, the officer acted in reliance on an outstanding arrest warrant that in fact had been quashed.  Id. at 4.  The error was traced to the court clerk's office, which had failed to notify the sheriff's office to update its computer records.  Id. at 4–5.  The Court reasoned that exclusion of the evidence seized during the arrest would not deter future mistakes by court employees because unlike police officers, "court clerks are not adjuncts to the law enforcement team" engaged in "ferreting out crime," and "have no stake in the outcome of particular criminal prosecutions."  Id. at 15; see also Krull, 480 U.S. at 350–51; People v. Gall, 30 P.3d 145, 150 (Colo. 2001) ("Because neutral judicial officers have no stake in the outcome of

13

particular criminal proceedings, the threat of exclusion cannot be expected to significantly modify their behavior."). Nor could suppression reasonably be expected to alter the behavior of the arresting officer, who simply relied on the police computer records. Evans, 514 U.S. at 15.

¶24 The People rely on this line of case law to argue that suppression is unwarranted here because the juvenile probation officer who performed the cheek swab is akin to the court employee in Evans for whom suppression would have no appreciable deterrent effect. We disagree for three reasons.

¶25 First, in the cases relied on by the People, the law enforcement official who conducted the search acted in reasonable reliance on information provided by a third party—in those cases, a court official or court employees. That information later proved to be inaccurate, because the third party—not the officer—made a mistake. Suppression served no appreciable deterrent purpose in those cases because the officers who conducted those searches had no reason to question the validity of the warrants under which they acted or otherwise suspect they were not complying with the law. In short, there was "no police illegality and thus nothing to deter." Leon, 468 U.S. at 921. "Penalizing the officer for the [third party]'s error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Leon, 468 U.S. at 921; see also Herring, 555 U.S. at 137–39, 144–45 (rejecting suppression where officer relied on outdated warrant in police records and mistake was attributed to the "nonrecurring and attenuated negligence" of another police employee).

14

¶26    Nothing in the record here, however, suggests the juvenile probation officer who performed Casillas's cheek swab did so in reasonable reliance on misinformation provided by a third party.  Unlike the magistrate in Leon, the court employee in Evans, or even the fellow police employee in Herring—third parties who provided erroneous information to the law enforcement officer who conducted the search—the juvenile probation officer here performed the cheek swab and collected Casillas's DNA himself.  Thus, the error giving rise to the unlawful search and seizure was not attenuated; suppression here would target the officer's own mistake, not someone else's.

¶27    Second, although juvenile probation officers are appointed by the court, see § 19-2-204(1)–(2), C.R.S. (2018), they are much more akin to "adjuncts to the law enforcement team" than judicial officers or court clerk employees, see Krull, 480 U.S. at 348, 350–51; Leon, 468 U.S. at 917.  As noted by Judge Webb in his dissent, juvenile probation officers have broad law enforcement powers.  Casillas, ¶ 43 (Webb, J., dissenting).  Like a law enforcement officer, a juvenile probation officer is considered a "peace officer" under Colorado law.  § 16-2.5-101(1), (3), C.R.S. (2018); § 19-2-926(4), C.R.S. (2018); cf. Minnesota v. Murphy, 465 U.S. 420, 432 (1984) (recognizing that a probation officer "is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers" (internal quotation marks omitted)).  As peace officers, juvenile probation officers have "authority to enforce all laws of the state of Colorado" and may carry firearms while performing their duties.  § 16-2.5-101(1), (2).  Moreover, juvenile probation officers may

take juveniles into temporary custody, see § 19-2-502(3), C.R.S. (2018), and may execute arrest warrants, see § 19-2-503, C.R.S. (2018).

¶28     Third, we disagree that the officer here was "performing nothing more than a supervisory function under the direction of the juvenile court." See Casillas, ¶ 38. CODIS exists to allow law enforcement to match DNA found at crime scenes with genetic profiles in the database in order to identify suspected perpetrators of crimes. A cheek swab performed to collect an individual's DNA for entry into the CODIS database therefore serves an inherent law enforcement purpose.

¶29     In their answer brief to this court, the People argue for the first time that suppression is unwarranted because the cheek swab was taken as a result of the juvenile probation officer's reasonable mistake of law. See Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530, 539 (2014) ("[W]e have looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation. . . ."). We disagree.

¶30     Heien addressed an officer's misinterpretation of the law as it pertained to whether there was any Fourth Amendment violation at all. 135 S. Ct. at 539 ("Here, . . . the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place."). In other words, in Heien, the officer's misunderstanding of the law factored into whether the seizure itself was reasonable. But that is not the question before us. Here, a court has concluded that the cheek swab taken

by the juvenile probation officer was an unreasonable search under the Fourth Amendment. The People do not challenge that ruling. The only question is whether the exclusionary rule applies.

¶31 Notably, the two cases cited in <u>Heien</u> for the proposition that <u>suppression is not warranted</u> because of an officer's reasonable mistake of law concerned situations where an officer reasonably relied on binding appellate case law that was subsequently overturned, <u>Davis</u>, 564 U.S. at 232 (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"), or an officer enforced an existing statute that was later deemed unconstitutional, <u>Krull</u>, 480 U.S. at 350 (reasoning that suppression would have little deterrent effect where officer "simply fulfilled his responsibility to enforce the statute as written" and statute was later declared unconstitutional). <u>See</u> <u>Heien</u>, __U.S.__, 135 S. Ct. at 539. Neither case concerned the officer's <u>misinterpretation</u> of the law; rather, in both <u>Davis</u> and <u>Krull</u>, the officer followed binding case law or the statute as written. The "mistake" of law in those cases, therefore, was not a question of the officer's interpretation, but rather, the fact that the law on which the officer relied was later deemed invalid — something the officer could not have foreseen. For that reason, suppression was not warranted in those cases.

¶32 Here, by contrast, the People do not contend that the juvenile probation officer reasonably followed the law as written but was mistaken as to its constitutionality. Rather, the People argue that the officer reasonably misinterpreted the law. But the search performed here was not based on any objectively reasonable interpretation of the

17

statute. Cf. Heien, 135 S. Ct. at 539–40 (2014) (noting that although the Fourth Amendment tolerates objectively reasonable mistakes of law, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce"). As recognized by the CBI's CODIS administrator, confirmed by the probation analyst at the State Court Administrator's Office, and conceded by the People below, the cheek swab taken by the juvenile probation officer violated the juvenile DNA collection statute because Casillas was under a deferred adjudication and he was not otherwise required under section 19-2-925.6 to submit a DNA sample. He was never "sentenced to probation"; he was placed under the supervision of the juvenile probation office as a condition of his deferred judgment.

¶33    Importantly, the statutory violation here concerned the propriety of the search itself, directly implicating Casillas's Fourth Amendment rights. See People v. McKinstry, 843 P.2d 18, 20 (Colo. 1993) ("[W]here an officer has obtained evidence in violation of a statute or regulation, the exclusionary rule is not triggered unless the unauthorized conduct also amounts to a constitutional violation."). Moreover, the Colorado Children's Code generally gives heightened protection to juvenile privacy. For instance, the legislative declaration to the Children's Code Records and Information Act, which governs, among other things, access to juvenile delinquency records, recognizes that information obtained through juvenile proceedings "is highly sensitive and has an impact on the privacy of children," and that "[t]he disclosure of sensitive information carries the risk of stigmatizing children." § 19-1-302(1)(a), C.R.S. (2018). Consistent with

18

this declaration, the Children's Code severely limits access to juvenile arrest, criminal, and probation records. See § 19-1-304(2)(b.5)–(c), C.R.S. (2018). In sum, a reasonably well-trained juvenile probation officer—familiar with the provisions of the Children's Code—should have known that the search of Casillas was illegal under the circumstances. See Herring, 555 U.S. at 145; Leon, 468 U.S. at 922 n.23.

¶34 As discussed above, the deterrence benefits of exclusion, and thus the rule's application, depend on the culpability of the law enforcement conduct at issue. Davis, 546 U.S. at 238. When the police act with "deliberate, reckless, or grossly negligent" disregard for Fourth Amendment rights, "or in some circumstances recurring or systemic negligence," Herring, 555 U.S. at 144, then the benefits of exclusion "tend to outweigh the resulting costs," Davis, 564 U.S. at 238 (citing Herring, 555 U.S. at 144). Put differently, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Herring, 555 U.S. at 143 (quoting Krull, 480 U.S. at 348–49).

¶35 Here, the juvenile probation officer who performed the buccal swab "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment." Id. Moreover, the record suggests this was not an isolated incident, given the email from the CBI's CODIS administrator to the probation analyst at the State Court Administrator's Office, acknowledging: "It looks like I have another CODIS hit to an offender with a deferred sentence" (emphasis added).

¶36    Finally, we conclude that suppression would have a deterrent effect.  The goal of the exclusionary rule is to "remov[e] inducements to unreasonable invasions of privacy." Leon, 468 U.S. at 900.    Indeed, the exclusionary rule "compel[s] respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."  Elkins v. United States, 364 U.S. 206, 217 (1960).  Left undisturbed, the court of appeals' decision would have the opposite effect: "[e]xempting evidence illegally obtained by a [juvenile probation] officer from the exclusionary rule would greatly increase the temptation to use the [juvenile probation] officer's broad authority to circumvent the Fourth Amendment."  United States v. Payne, 181 F.3d 781, 788 (6th Cir. 1999).  Given that law enforcement would benefit from the ability to identify more suspected perpetrators of crimes if the database were more comprehensive, and without the risk that unlawfully obtained evidence would be excluded from future criminal prosecutions, the incentive exists to take DNA from every juvenile whether authorized or not.  This is the kind of constitutional hazard that the exclusionary rule was meant to reduce.

## III.  Conclusion

¶37    We hold that the exclusionary rule requires suppression of the evidence derived from the juvenile probation officer's unauthorized collection of Casillas's DNA in this case.  All the evidence connecting Casillas to the carjacking was derived from the initial unlawful seizure of his DNA.  Without the unauthorized cheek swab, Casillas's DNA would not have been in CODIS, the police would not have obtained a match to Casillas's

20

genetic profile, and the detective could not have prepared the photo array presented to the victim and used to identify Casillas. Accordingly, we reverse and remand with instructions to vacate Casillas's conviction.

**JUSTICE SAMOUR** dissents.
**JUSTICE GABRIEL** does not participate.

**JUSTICE SAMOUR**, dissenting.

¶38    Billy Joel aptly recognized in one of his hit songs that "we're only human" and are "allowed to make [our] share of mistakes."  Billy Joel, <u>You're Only Human (Second Wind)</u>, <u>on</u> Billy Joel's Greatest Hits (Columbia Rec. 1985).  Yet, today, the majority suppresses evidence derived from a search conducted as a result of a juvenile probation officer's mistake of law, without meaningfully analyzing whether the mistake was objectively reasonable.  Because the ultimate touchstone of the Fourth Amendment is reasonableness—not perfection—and because the exclusionary rule does not seek to deter objectively reasonable mistakes, I respectfully dissent.

## I.    Introduction

¶39    The majority discusses this case's factual and procedural history in some detail. Maj. op. ¶¶ 7–15.  Therefore, I do not repeat it here.

¶40    I agree with the majority that, since the People did not seek review of the court of appeals' conclusion that Casillas's cheek swab violated both the DNA collection statutory provision in question and the Fourth Amendment, the only issue before us is whether application of the exclusionary rule is warranted as a remedy. <u>Id.</u>, ¶ 17.  In analyzing this question, I have no qualms with the majority's determinations that juvenile probation officers are more akin to "adjuncts to the law enforcement team" than to judicial officers or court employees, <u>see</u> <u>id.</u>, ¶ 27, and that the juvenile probation officer who collected Casillas's cheek swab did not rely on misinformation provided by a third party, <u>see</u> <u>id.</u>, ¶ 26.  Further, like the majority, I cannot side with the court of appeals' determination that suppression of the cheek swab is not justified because the juvenile probation officer

1

was simply performing a supervisory function pursuant to instructions from the juvenile court. Id., ¶ 28.

¶41    Where my colleagues and I part ways is (1) in their implied conclusion that the mistake of law by the juvenile probation officer was not objectively reasonable and, instead, rose to the level of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights or recurring or systemic negligence, see id., ¶¶ 34–35;[1] and (2) in their determination that suppression would have a deterrent effect because, otherwise, "the incentive exists to take DNA from every juvenile whether authorized or not," see id., ¶ 36. These two disagreements are significant because the question of suppression "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Herring v. United States, 555 U.S. 135, 137 (2009). I address each point of contention in turn.

## II.    Analysis

### A. The Mistake of Law Was Objectively Reasonable

¶42    In Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530 (2014), the United States Supreme Court addressed whether a traffic stop based on a police officer's mistaken understanding of the law violated the Fourth Amendment. There, an officer pulled over

---

[1] The majority states that the juvenile probation officer "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment" and that the record before us "suggests this was not an isolated incident." Maj. op. ¶ 35.

2

a car after noticing that only one of its brake lights was functional. Id. With the defendant's consent, two officers searched the car and found cocaine. Id. The defendant was subsequently charged with a cocaine trafficking offense. Id. at 535. Before trial, the court denied the defendant's motion to suppress the evidence recovered from the car, rejecting his argument that the stop and search violated the Fourth Amendment. Id.

¶43 The North Carolina Court of Appeals reversed, holding that the stop was objectively unreasonable and ran afoul of the Fourth Amendment because the vehicle code required only one working brake light.[2] Id. On appeal, the prosecution did not challenge the intermediate appellate court's interpretation of the vehicle code; consequently, the North Carolina Supreme Court assumed that Heien's faulty brake light was not a violation of the vehicle code. Id. But the North Carolina Supreme Court nevertheless concluded that the stop was valid and consistent with the Fourth Amendment because the officer's mistaken interpretation of the law was reasonable. Id.

¶44 The United States Supreme Court agreed. The Court emphasized that "[t]o be reasonable is not to be perfect," and since the Fourth Amendment's "ultimate touchstone . . . is reasonableness," it "allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." Id. at 536 (quoting Riley v. California, 573 U.S. __, 135 S. Ct. 2473, 2482 (2014)) (internal quotation

---

[2] The court focused on the code's references to "a stop lamp" and "[t]he stop lamp" in the singular. Heien, 135 S. Ct. at 535.

marks omitted). The Court added that, just as searches and seizures based on mistakes of fact can be reasonable, so too can searches and seizures based on mistakes of law be reasonable. Id.

¶45 Under Heien, an officer may be reasonably mistaken on the facts or on the law, but

> [w]hether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

Id. "[T]reating legal and factual errors alike in this context" is nothing new; it is supported by "cases dating back two centuries." Id. at 536–37.

¶46 Casillas argues that Heien does not apply here because, rather than address the scope of the exclusionary rule, it found that no violation of the Fourth Amendment occurred. However, the Court in Heien acknowledged that, in previous decisions, it has "looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all." Id. at 539. In such cases, the Court has either found or assumed a Fourth Amendment violation, and the evaluation of the reasonableness of an officer's mistake of law has been "limited to the separate matter of remedy." Id.

¶47 Moreover, Casillas ignores that, since mere negligence by a government official is insufficient to constitute a Fourth Amendment violation, it certainly cannot "meet the more stringent test for triggering the exclusionary rule." Herring, 555 U.S. at 145. "To trigger the exclusionary rule" as a remedy for a Fourth Amendment violation, "police

4

conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 144. As the Supreme Court has reiterated, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," not "mistakes [that] are the result of negligence." Id. at 144, 147.

¶48 Like Casillas, the majority glosses over the holding in Heien and strains to distinguish it from this case, noting that "Heien addressed an officer's misinterpretation of the law as it pertained to whether there was any Fourth Amendment violation . . . ." Maj. op. ¶ 30. Put differently, the majority erroneously views Heien as limited to whether a Fourth Amendment violation occurred and having no relevance to whether application of the exclusionary rule is warranted. Id. The majority's overly narrow reading of Heien misconstrues the Supreme Court's analysis. Additionally, it makes no logical sense to apply one standard of "objectively reasonable mistake" to examine Fourth Amendment violations and a completely different standard of "objectively reasonable mistake" to determine application of the exclusionary rule. And, to the extent that a different standard were to be applied, it would have to be more stringent and require conduct that is more egregious in the exclusionary rule context. Herring, 555 U.S. at 144, 147.

¶49 There was no conduct sufficiently deliberate and sufficiently culpable here to trigger the exclusionary rule. Therefore, under United States Supreme Court jurisprudence, including Heien and Herring, the exclusionary rule is inapplicable in this case.

¶50 The DNA collection statutory provision in question, § 19-2-925.6, C.R.S. (2018), which addresses the "[g]enetic testing of adjudicated offenders," provides in pertinent part,

> (1) Beginning July 1, 2007, each of the following adjudicated offenders shall submit to and pay for collection and a chemical testing of the offender's biological substance sample to determine the genetic markers thereof, unless the offender has already provided a biological substance sample for such testing pursuant to a statute of this state:
>
> . . . .
>
> (e) Every offender sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult. <u>This paragraph (e) shall not apply to an offender granted a deferred adjudication, unless otherwise required to submit to a sample pursuant to this section</u> or unless the deferred adjudication is revoked and a sentence is imposed. The sample shall be collected:
>
> (I) From an offender committed to the department of human services, by the department during the intake process but in any event within thirty days after the offender is received by the department;
>
> (II) From an offender sentenced to county jail or to community corrections, by the sheriff or by the community corrections program within thirty days after the offender is received into the custody of the county jail or the community corrections facility;
>
> (III) <u>From an offender sentenced to probation, by the judicial department within thirty days after the offender is placed on probation</u>; and
>
> (IV) From an offender who receives any other sentence, by the judicial department within thirty days after the offender is sentenced.

§ 19-2-925.6 (emphases added).

¶51 Under subsection (1)(e), Casillas was not required to submit to collection of a biological substance sample because he was granted a deferred adjudication in 2008 after pleading guilty to an offense that would constitute a felony if committed by an adult.

Had he not been granted a deferred adjudication and, instead, been sentenced to probation, he would have been required to provide a biological substance sample. See § 19-2-925.6(1)(e)(III). That he received a deferred adjudication meant that no adjudication entered and no sentence (including to probation) was imposed. But the question before us is not whether the juvenile probation officer violated the statute by collecting Casillas's cheek swab; there is no dispute that he did.[3] The question we are confronted with is whether the juvenile probation officer's mistaken understanding of the statute as requiring Casillas to submit a biological substance sample was objectively reasonable. The answer, in my view, is a resounding "yes."

¶52 The second sentence in subsection (1)(e) and the single sentence in subsection (1)(e)(III) can reasonably be read together as stating that the requirement to submit to collection of a biological substance sample does not apply to an offender who receives a deferred adjudication, "unless" such offender is "sentenced to probation." Id. Of course,

---

[3] The majority asserts that "nothing in the record sheds light on [the juvenile probation officer's] reasons" for collecting a cheek swab from Casillas. Maj. op. ¶ 7. Respectfully, this is something of a red herring. The district court reasonably concluded from the record that Casillas "consented to the taking of the genetic material" as a condition of his supervision. The court of appeals reached the same conclusion. See People v. Casillas, 2015 COA 15, ¶ 2 ("The terms of the deferred adjudication required [Casillas] to be under the supervision of the juvenile probation department," and "Casillas' juvenile probation officer later swabbed Casillas' cheek for a DNA sample."). Furthermore, there is no disagreement that subsection (1)(e) governs the collection—by the judicial department (which includes probation)—of any genetic or biological substance sample from a juvenile offender like Casillas believed, albeit incorrectly, to have been sentenced to probation.

7

as mentioned, Casillas was not "sentenced" to probation, and could not have been "sentenced" to probation, because he received a deferred adjudication. But the juvenile court ordered him supervised by probation while on his deferred adjudication. And the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication is too nuanced to allow us to fairly conclude that a juvenile probation officer's failure to discern it is a deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights. Because Casillas's deferred adjudication was ordered supervised by probation, it was objectively reasonable for the juvenile probation officer to believe, admittedly mistakenly, that subsection (1)(e) required Casillas to provide a biological substance sample.

¶53 Significantly, the record reflects that the juvenile probation officer was not the only one who misunderstood subsection (1)(e). The district court judge who denied Casillas's motion to suppress, an individual trained in the law who possesses legal experience, appears to have construed subsection (1)(e) as the juvenile probation officer did. The judge believed that Casillas was required to provide a biological substance sample, even though he received a deferred adjudication, because he was "sentenced to probation." In other words, the judge missed the same subtle difference in the statute the juvenile probation officer did between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication. In concluding that the juvenile probation officer did not violate the statute, the judge reasoned that the evidence at the hearing established that Casillas "had been placed on a deferred adjudication with

8

probation,"[4] and that "[s]ubsection (e)(III) indicates that a genetic sample may be taken from an offender sentenced to probation."[5]

¶54 One other judicial officer in this case blurred the difference between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication. In 2009, the judicial officer presiding over Casillas's underlying juvenile case ordered "<u>Probation</u> and Jurisdiction terminated successfully." (Emphasis added.) And the probation analyst referenced by the majority likewise mentioned in an email that Casillas had "completed his deferred adjudication" and had been "<u>released from probation</u> in May 2009." (Emphasis added.)

---

[4] Elsewhere in its written order, the trial court seemed to incorrectly equate the fact that Casillas's deferred adjudication was to be supervised by probation with being "placed on probation."

[5] The majority implies that the district court did not misunderstand the statute or fail to apprehend the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication. Maj. op. ¶ 12. Instead, asserts the majority, the district court had an insufficient record before it, which caused it to inaccurately believe Casillas had been sentenced to probation. <u>Id.</u> The record does not support the majority's perception. In its written order denying the motion to suppress, the district court expressly noted that Casillas had "entered into a deferred adjudication" and "was also placed on probation." Later in the same order, the district court reiterated that it "appear[ed] undisputed that [Casillas] had been placed on a deferred adjudication with probation." Thus, contrary to the majority's characterization, the district court did not rely on a "mistaken factual premise"; rather, the district court mistakenly believed, as did the juvenile probation officer, that Casillas's probation-supervised deferred adjudication meant he was "an offender sentenced to probation" who was subject to the collection requirement in subsection (1)(e). <u>Id.</u>

9

¶55 The legislature made a similar mistake in 2006 in drafting the predecessor to section 19-2-925.6, although that statute never became effective. In the 2006 Session Laws, the legislature stated:

> (1) Beginning July 1, 2007, the following adjudicated delinquents must submit to and pay for a chemical testing of the person's biological substance sample to determine the genetic markers thereof:
>
> (a) Every person sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult. This paragraph (a) shall not apply to persons <u>sentenced to probation pursuant to a deferred adjudication</u>, unless otherwise required to submit to a sample in this section, or unless the deferred sentencing is revoked and a sentence is entered. The sample shall be collected:
>
> . . . .
>
> (III) <u>For sentences to probation</u>, no later than thirty days after the offender is placed on probation.

Ch. 339, § 19-2-925.6, 2006 Colo. Sess. Laws 1687, 1690–91 (emphases added). Thus, like the juvenile probation officer, the district court judge who denied Casillas's motion to suppress, the juvenile court judge who presided over Casillas's underlying case, and the probation analyst quoted by the majority, the 2006 legislature apparently believed that a defendant ordered supervised by probation while on a deferred adjudication was a defendant "<u>sentenced to probation</u> pursuant to a deferred adjudication." <u>Id.</u> (emphasis added).

¶56 Although the majority gives <u>Heien</u> short shrift, the Supreme Court's analysis is instructive in assessing the reasonableness of the juvenile probation officer's error of law. Notwithstanding its acknowledgement that the North Carolina statute's reference to "<u>a</u> stop lamp" in the singular suggested that only one working brake light was required, the

10

Court had "little difficulty concluding that the officer's error of law was reasonable." Heien, 135 S. Ct. at 540 (emphasis in original). The Court observed that the statute also provided that "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps," see id. (quoting N.C. Gen. Stat. Ann. § 20-129(g) (2007)) (alteration and emphasis in original), which "suggest[ed] to the everyday reader of English that a 'stop lamp' [was] a type of 'rear lamp,'" see id. (quoting § 20-129(g)). Additionally, a different subsection of the statute, subsection (d), required cars to "have all originally equipped rear lamps or the equivalent in good working order," which, the Court explained, was "arguably" an "indicat[ion] that if a vehicle has multiple 'stop lamp[s],' all must be functional." Id. (quoting § 20-129(d)) (second alteration in original). Given the use of the word "other" in subsection (g), the Court determined that "it would at least have been reasonable to think" that the "rear lamps" referenced in subsection (d) included brake lights. Id.

¶57 The juvenile probation officer's mistaken understanding of subsection (1)(e) was no less reasonable than the officer's mistaken understanding of the "stop lamp" provision addressed in Heien. Just as it was reasonable for the officer in Heien to think that the North Carolina traffic code required two functional brake lights, it was reasonable for the juvenile probation officer to think that subsection (1)(e) required Casillas to submit to the collection of a biological substance sample. Moreover, as was the case with the North Carolina statute in Heien, subsection (1)(e) "had never been previously construed by [the state] appellate courts" when the mistake of law occurred. Id.

11

¶58 There is actually more proof here than in <u>Heien</u> that the challenged mistake of law was reasonable because, as indicated, the juvenile probation officer was not the only one who made it. Although this is a circumstance the majority disregards, it is relevant to our analysis. <u>Cf.</u> <u>People v. Glasser</u>, 293 P.3d 68, 72 (Colo. App. 2011). In <u>Glasser</u>, the defendant urged the trial court to suppress, among other things, the DNA evidence used to identify him because his biological substance sample was collected and uploaded onto CODIS erroneously based on a plea bargain in an earlier case that included an agreement to an illegal sentence. <u>Id.</u> at 72–73. As relevant here, the court of appeals refused to apply the exclusionary rule, finding that the mistake by the prosecutor could "hardly be considered flagrant, given that defense counsel approved and the trial court accepted the pleas" in the earlier case. <u>Id.</u> at 74. While <u>Glasser</u> preceded <u>Heien</u>, its rationale is consistent with it.

¶59 The majority repeatedly notes that the People failed to assert—before both the district court and the court of appeals—that Casillas's cheek swab was collected due to "a good faith mistake of fact or law." Maj. op. ¶ 11; <u>see also</u> <u>id.,</u> ¶ 14 (explaining that Judge Webb, in his dissent, observed that the prosecution did not invoke the statutory "good faith mistake" exception under section 16-3-308, C.R.S. (2018)). This is inherently unfair. We granted Casillas's petition for certiorari in this case to review "[w]hether the court of appeals erred when it concluded that an unreasonable search by a juvenile probation officer does not require <u>the application of the exclusionary rule</u>." <u>Id.,</u> ¶ 6 n.1 (emphasis added). I do not understand how we can grant certiorari review on an issue that directly deals with the applicability of the exclusionary rule, and then address the

12

issue on the merits while tying the People's hands by silencing them with respect to a significant aspect of that rule's purview.

¶60 And, regardless of what arguments a party may have previously advanced, Herring makes crystal clear that "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." 555 U.S. at 143 (quoting United States v. Leon, 468 U.S. 897, 911 (1984)); see also Leon, 468 U.S. at 920 (when it is "plainly apparent" that an officer acted reasonably, suppression of the evidence "will not further the ends of the exclusionary rule" because such suppression "can in no way affect his future conduct," except to "make him less willing to do his duty") (internal quotation marks omitted). By law, we must evaluate the flagrancy of the juvenile probation officer's conduct in order to determine whether the exclusionary rule applies. Casillas is asking us to reverse the court of appeals' decision and to apply the exclusionary rule, and we cannot properly address the merits of his request without assessing the reasonableness of the juvenile probation officer's mistake of law. Whether the juvenile probation officer's mistake of law was reasonable is at the heart of this appeal and critical to our decision.

¶61 Rather than meaningfully evaluate the reasonableness of the juvenile probation officer's error of law, the majority appears to conclude, rather summarily, if not circularly, both that "the search performed here was not based on any objectively reasonable interpretation of the statute," see Maj. op. ¶ 32, and that the benefits of exclusion outweigh the costs, see id., ¶¶ 34–35. The majority points out that (1) "the cheek swab taken by the juvenile probation officer violated the juvenile DNA collection statute"; (2)

13

"[i]mportantly, the statutory violation here concerned the propriety of the search itself, directly implicating Casillas's Fourth Amendment rights"; (3) the juvenile probation officer "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment"; and (4) because the juvenile probation officer "may properly be charged with [such] knowledge[]," "the benefits of exclusion tend to outweigh the costs." Id., ¶¶ 32–35. The first two points, which are undisputed, are irrelevant to whether the juvenile probation officer's mistake was objectively reasonable, and the last two points are conclusory and unaccompanied by any rationale or explanation.

¶62    Despite Herring's mandate, the majority seems satisfied with a standard that generally looks at whether the government official made a mistake and pays little attention to the reasonableness of the mistake. In Heien, Heien and the amici advocated for a similar standard based on "the well-known maxim, 'Ignorance of the law is no excuse,'" and argued "that it is fundamentally unfair to let police officers get away with mistakes of law when the citizenry is accorded no such leeway." 135 S. Ct. at 540. The Court was not persuaded:

> Though this argument has a certain rhetorical appeal, it misconceives the implication of the maxim. The true symmetry is this: Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law. If the law required two working brake lights, Heien could not escape a ticket by claiming he reasonably thought he needed only one; if the law required only one, [the officer] could not issue a valid ticket by claiming he reasonably thought drivers needed two. But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop. And Heien is not appealing a

14

brake-light ticket; he is appealing a cocaine-trafficking conviction as to which there is no asserted mistake of fact or law.

Id. (emphases added).

¶63 The majority also relies on the Colorado Children's Code Records and Information Act ("the Act") to support its decision. Maj. op. ¶ 33. This is a stretch; the Act is unavailing. There is no support for the majority's suggestion that the "heightened protection to juvenile privacy" under the Act leads to heightened protection under the Fourth Amendment or somehow expands the scope of the exclusionary rule. Id. The majority cites the legislative declaration in the Act—which provides that information obtained through juvenile proceedings is highly sensitive and has an impact on the privacy of children, and that its disclosure carries the risk of stigmatizing children—as the premise for its conclusion that the juvenile probation officer "should have known that the search of Casillas was illegal under the circumstances." Id. Respectfully, this conclusion is a non-sequitur. Neither the highly sensitive nature of information acquired through juvenile proceedings nor the risk accompanying the dissemination of such information bears on whether the juvenile probation officer's understanding of subsection (1)(e) was objectively reasonable.

¶64 In any event, I believe the majority misses the point. The issue is not whether the juvenile probation officer was "familiar with the provisions of the Children's Code." Id. He was obviously familiar with the provision of the Children's Code addressing the collection of DNA from juvenile offenders who receive a deferred adjudication. Indeed, he collected a cheek swab from Casillas and submitted the sample to be uploaded onto

15

CODIS. The issue is whether the juvenile probation officer's <u>interpretation</u> of subsection (1)(e) was objectively reasonable.

¶65 Finally, the majority implies that this was recurring or systemic negligence because "the record suggests" that the improper collection of a biological substance sample from Casillas "was not an isolated incident." <u>Id.</u>, ¶ 35. Again, I disagree. The record is barren of any evidence of recurring or systemic negligence.

¶66 The majority's reliance on a single email, which was sent by the CODIS administrator to the State Court Administrator's Office, is misplaced. That email stated: "It looks like I have <u>another</u> CODIS hit to an offender with a deferred sentence. Would you please check on Ismael Casillas . . . . It looks like he was not eligible, but I need you to confirm that." (Emphasis added.) First, this message establishes that there had been more than one CODIS match to an offender with a deferred sentence, not that there had been more than one CODIS match to an <u>ineligible</u> offender with a deferred sentence. Second, even under the majority's strained interpretation of the message as referring to more than one CODIS match implicating an ineligible offender with a deferred sentence, that could mean two such matches or twenty such matches, and while twenty over a relatively short period may establish "recurring or systemic negligence," two over an unknown period certainly does not.

¶67 In short, under the circumstances present, it was objectively reasonable for the juvenile probation officer to think that Casillas was on probation and, therefore, required to submit to collection of a biological substance sample. Because the juvenile probation officer's mistake of law was objectively reasonable, it cannot be deemed to rise to the level

16

of deliberate, reckless, or grossly negligent disregard of Casillas's Fourth Amendment rights. Further, the record does not support a finding of recurring or systemic negligence. Accordingly, I would conclude that this case falls woefully short of the type of flagrant conduct targeted by the exclusionary rule.

## B. Suppression Would Not Have a Deterrent Effect

¶68 The goal of the exclusionary rule is "to deter improper police conduct"; therefore, the rule should not be applied where the "deterren[t] purpose is not served." People v. Altman, 960 P.2d 1164, 1168 (Colo. 1998) (quoting People v. Deitchman, 695 P.2d 1146, 1160 (Colo. 1985) (Dubofsky, J., concurring)). Moreover, for the exclusionary rule to apply, "the benefits of deterrence must outweigh" the heavy costs of suppressing reliable and trustworthy evidence bearing on guilt or innocence. Herring, 555 U.S. at 141. Stated differently, the deterrence must be "worth the price paid by the justice system." Id. at 144.

¶69 The majority posits that failure to apply the exclusionary rule here would create an "incentive [ ] to take DNA from every juvenile whether authorized or not" because law enforcement "would benefit from the ability to identify more suspected perpetrators of crimes if the database were more comprehensive" and there would be no "risk that unlawfully obtained evidence would be excluded from future criminal prosecutions." Maj. op. ¶ 36. Respectfully, I am unmoved by this sky-will-fall contention. The majority forgets that "[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must be objectively reasonable." Heien, 135 S. Ct. at 539 (emphases in original). In Heien, the Court rejected Heien's doomsday claim that

17

failure to find a Fourth Amendment violation would "discourage officers from learning the law." Id. The Court explained that the subjective understanding of an officer is irrelevant. Id. Thus, "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." Id. As the majority in this case recognizes, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." Maj. op. ¶ 32 (quoting Heien, 135 S. Ct. at 539–40).

¶70 In any case, if the majority were to determine that the exclusionary rule is inapplicable here, a probation officer in the future would have a difficult, if not impossible, time convincing us that his mistake in collecting a biological substance sample from an ineligible deferred adjudication offender is objectively reasonable. This is so because there would then be precedent clarifying that a juvenile offender on a deferred adjudication for what would constitute a felony if committed by an adult is not required to submit to a biological substance sample under subsection (1)(e) simply because he is ordered supervised by probation.

¶71 Contrary to the majority's ruling, there is no basis in the record to find that application of the exclusionary rule serves the purpose of deterring improper conduct here. To be sure, the juvenile probation officer in this case made a mistake of law. But the mistake was objectively reasonable. Consequently, there is no flagrant conduct to be deterred here. Nor will the benefits of deterrence, if any, outweigh the heavy costs of exclusion to the justice system.

### III.    Conclusion

¶72    In sum, I respectfully disagree with the majority's decision to apply the exclusionary rule in this case.  Instead, I would affirm the judgment of the court of appeals on the grounds I have articulated.

Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 24, 2018
AS MODIFIED OCTOBER 15, 2018

**2018 CO 78M**

**No. 15SC292, <u>Casillas v. People</u> — Evidence — Searches and Seizures — Exclusionary Rule.**

In this criminal appeal, the supreme court reviews whether the exclusionary rule requires the suppression of evidence derived from a juvenile probation officer's unauthorized collection of DNA from a juvenile in violation of section 19.2.925.6, C.R.S. (2018) and the Fourth Amendment.  The supreme court holds that juvenile probation officers are properly considered adjuncts to law enforcement; the officer's collection of the juvenile's DNA for uploading to CODIS served an inherent law enforcement function; nothing in the record suggests the officer conducted the buccal swab search in reliance on misinformation provided by a third party; and the unlawful search here was not based on a reasonable misinterpretation of the law.  Because suppression would have a deterrent effect by removing incentives to collect DNA from ineligible juvenile offenders, the supreme court holds that suppression is warranted.   Accordingly, the court reverses the judgment of the court of appeals and remands the case with instructions to vacate petitioner's conviction.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 78M

**Supreme Court Case No. 15SC292**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 12CA703

**Petitioner:**

Ismael Casillas,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Reversed.**
*en banc*
September 24, 2018

**Modified Opinion.  Marked revisions shown.**

**Attorneys for Petitioner:**
Megan Ring, Public Defender
M. Shelby Deeney, Deputy Public Defender
    *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
L. Andrew Cooper, Deputy Attorney General
    *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE SAMOUR** dissents.
**JUSTICE GABRIEL** does not participate.

¶1 Colorado law requires certain juvenile offenders to submit to collection of their DNA for testing. § 19-2-925.6(1), C.R.S. (2018). However, this requirement "shall not apply to an offender granted a deferred adjudication, unless otherwise required to submit to a sample pursuant to [section 19-2-925.6] or unless the deferred adjudication is revoked and a sentence is imposed." § 19-2-925.6(1)(e).

¶2 In 2008, a juvenile probation officer swabbed the cheek of Petitioner Ismael Casillas, then a juvenile, to collect a DNA sample. The probation officer's collection of Casillas's DNA violated section 19-2-925.6(1) because Casillas had been granted a one-year deferred adjudication and he was not otherwise required under the statute to submit a DNA sample. His genetic markers were nevertheless uploaded to the federal Combined DNA Index System (CODIS).

¶3 Several months after Casillas successfully completed the terms of his deferred adjudication and his juvenile case had been dismissed, law enforcement investigators matched DNA evidence recovered from a stolen vehicle with the sample in the CODIS database taken from Casillas during his juvenile deferred adjudication. As a result of the DNA match, Casillas was identified and charged in connection with a carjacking.

¶4 Before trial, Casillas moved to suppress all evidence derived from the DNA match, arguing that evidence derived from the unauthorized cheek swab should be excluded as the fruits of an unlawful search in violation of his Fourth Amendment rights. The trial court denied the motion, and a jury later convicted Casillas of criminal mischief.

¶5     Casillas challenged the trial court's suppression ruling on appeal. In a published, split ruling, the court of appeals affirmed Casillas's conviction. People v. Casillas, 2015 COA 15, __ P.3d __. The division unanimously held that the cheek swab violated both the juvenile DNA collection statute and the Fourth Amendment. See id. at ¶¶ 3, 18, 22, 41. The majority held that suppression was nevertheless unwarranted because the officer who performed the cheek swab was "performing nothing more than a supervisory function under the direction of the juvenile court," and therefore, suppression "would have no deterrent value." Id. at ¶ 38. Judge Webb dissented, concluding that Casillas's motion to suppress should have been granted. Id. at ¶¶ 42, 54 (Webb, J., dissenting).

¶6     We granted Casillas's petition for a writ of certiorari to review whether the exclusionary rule requires suppression of the evidence derived from the juvenile probation officer's unauthorized collection of Casillas's DNA in this case.[1] We conclude that it does. Accordingly, we reverse and remand with instructions to vacate Casillas's conviction.

---

[1] We granted certiorari to review the following issues:

1. Whether the court of appeals erred when it concluded that an unreasonable search by a juvenile probation officer does not require the application of the exclusionary rule.

2. Whether taking evidence in violation of the applicable statute requires suppression of that evidence.

4

## I. Facts and Procedural History

¶7        In June 2008, Petitioner Ismael Casillas, then a juvenile, entered into a stipulated, one-year deferred adjudication for drug possession. The stipulation required him to be under the supervision of the juvenile probation department. Soon thereafter, a juvenile probation officer subjected Casillas to a buccal swab (commonly referred to as a "cheek swab")[2] and entered his genetic markers into CODIS.[3] Why the officer took the swab remains unknown; nothing in the record sheds light on his reasons for doing so. Casillas eventually successfully completed the terms of his deferred adjudication, and his case was dismissed with prejudice in May 2009.

¶8        Several months later, three young men ambushed an older man and stole his car. Within hours, the victim's car was found wrecked. A crime scene investigator discovered blood stains on the inside of the front passenger door, and the police submitted samples of this blood evidence to the Colorado Bureau of Investigation (CBI) for testing against

---

[2] A buccal swab is a method of gathering DNA that typically involves rubbing a cotton swab inside a subject's mouth against the interior of his or her cheek.

[3] The federal Combined DNA Index System—CODIS, for short—is a set of databases available to law enforcement agencies across the country for law enforcement purposes. See Frequently Asked Questions on CODIS and NDIS, Fed. Bureau of Investigation, https://perma.cc/C97H-Q58M. Using CODIS, law enforcement officers can compare crime scene evidence to a database of DNA profiles obtained from convicted offenders. Id. CODIS can also be used to link DNA evidence obtained from different crime scenes, thereby identifying serial criminals. Id.

DNA profiles in CODIS. This testing revealed that the blood evidence found in the car matched the profile for Casillas.

¶9 In the process of comparing the blood evidence against profiles in CODIS, a CODIS administrator for the CBI learned that Casillas had not been eligible for DNA testing. The CODIS administrator nevertheless informed the detective who was investigating the carjacking of the match, noting that Casillas's DNA had been collected for previous offenses that did not qualify for CODIS entry. Based on the CODIS match, the detective proceeded to include Casillas in a photo array presented to the carjacking victim. The victim identified Casillas in the photo array as one of his assailants. As a result, Casillas was arrested and charged with aggravated robbery and menacing.

¶10 Before trial, Casillas moved to suppress the DNA and photo array identification, arguing that the collection of his DNA and uploading of his genetic markers to CODIS was statutorily unauthorized and violated his Fourth Amendment rights. At the suppression hearing, Casillas presented email correspondence showing that, when the blood evidence from the stolen car was matched with his DNA profile in CODIS, the CBI's CODIS administrator realized that Casillas's DNA profile had been improperly uploaded into the system. The CODIS administrator contacted a probation analyst with the State Court Administrator's Office to confirm, writing: "It looks like I have another CODIS hit to an offender with a deferred sentence . . . . It looks like he was not eligible, but I need you to confirm that." The probation analyst responded, confirming that Casillas was a juvenile "under a deferred adjudication for . . . a felony drug charge," that

6

he "successfully completed his deferred adjudication," and that Casillas therefore was "not eligible for DNA testing on this case." Casillas also presented records reflecting that the detective who included Casillas in the photo array based on the DNA match knew that the match was based on a "non-qualifying offense submission." Records admitted at the suppression hearing further showed that, the same day the CODIS administrator disclosed the match to the detective, Casillas's DNA profile was expunged from the CODIS database, apparently at the request of the probation analyst from the State Court Administrator's Office. The juvenile probation officer who took Casillas's cheek swab did not testify.

¶11    Casillas argued that the buccal swab conducted by the juvenile probation officer was an unlawful search under the Fourth Amendment, and that both the DNA identification and photo-array identification should be excluded as fruits of an unlawful search and seizure of his genetic markers. The People conceded that the collection of Casillas's DNA was not authorized under section 19-2-925.6, but argued that suppression was unwarranted as a remedy for the statutory violation. In so doing, the People did not contend that the probation officer took the cheek swab as the result of a good faith mistake of fact or law. See § 16-3-308, C.R.S. (2018) (permitting proponent of evidence to argue that evidence seized by a peace officer was the result of a "good faith mistake" or "technical violation" and thus should not be suppressed). Instead, the People argued that the buccal swab was justified under the "special needs" exception to the warrant

requirement under the Fourth Amendment, citing People v. Shreck, 107 P.3d 1048, 1052 (Colo. App. 2004).

¶12 The trial court denied Casillas's motion. In its written order, the court noted that it was not given a copy of the order placing Casillas on a deferred adjudication, and inaccurately described Casillas as having been "placed on probation." From this mistaken factual premise, the court reasoned that the cheek swab did not violate the juvenile DNA collection statute because section 19-2-925.6(1)(e)(III) indicates that a sample may be taken from a juvenile felony offender who is "sentenced to probation." The trial court further reasoned that, even if the search was not statutorily authorized, suppression was unwarranted because there was no evidence of willful or recurring violation of the statute. The court also agreed with the People that the search was justified under the special needs exception to the warrant requirement, and therefore did not violate the Fourth Amendment. At trial, a jury ultimately convicted Casillas of criminal mischief (a lesser non-included offense) but acquitted him of all other counts. The court sentenced Casillas to six years of probation.

¶13 In a divided opinion, the court of appeals affirmed the trial court's suppression ruling, but on different grounds. People v. Casillas, 2015 COA 15, ¶ 41, __ P.3d __. The division unanimously held that Casillas's cheek swab violated the juvenile DNA collection statute because: (1) it was undisputed that the juvenile court had granted Casillas a deferred adjudication; (2) he was not required to submit a DNA sample under another section of the juvenile DNA collection statute; and (3) he had successfully

8

completed his deferred adjudication. See id. at ¶¶ 3, 18, 41. It also unanimously held that the cheek swab was an unreasonable search under the Fourth Amendment. See id. at ¶¶ 22, 41. The division majority held that suppression was nevertheless unwarranted because the officer who performed the cheek swab was "performing nothing more than a supervisory function under the direction of the juvenile court," and therefore, suppression "would have no deterrent value." Id. at ¶¶ 38, 41. Accordingly, the division majority affirmed Casillas's conviction. Id. at ¶¶ 3, 41.

¶14     Judge Webb dissented, disagreeing with the majority's assertion that a juvenile probation officer performs a merely supervisory function for the juvenile court and instead reasoning that juvenile probation officers have broad law enforcement powers. Id. at ¶¶ 43–44 (Webb, J., dissenting). He argued that juvenile probation officers have a stake in law enforcement activities because they provide information for arrest warrants, execute arrest warrants, take suspects into temporary custody, and otherwise enforce the laws of the state. Id. at ¶ 47. He also noted that the prosecution could have, but did not, invoke the statutory "good faith mistake" exception under section 16-3-308, and thus, any lack of explanation in the record regarding the probation officer's reason for taking the cheek swab weighs in favor of—not against—suppression. Id. at ¶¶ 51–52. Because suppression would deter future violations, Judge Webb concluded, Casillas's motion to suppress should have been granted. Id. at ¶¶ 50–54.

¶15     We granted Casillas's petition for a writ of certiorari to review the court of appeals' opinion. The People did not file a cross-petition to challenge the court of appeals'

conclusions that Casillas's cheek swab violated the juvenile DNA collection statute and the Fourth Amendment.

## II. Analysis

¶16 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" for purposes of the Fourth Amendment. Maryland v. King, 569 U.S. 435, 446 (2013).

¶17 Here, the court of appeals unanimously concluded that Casillas's cheek swab violated both the juvenile DNA collection statute and the Fourth Amendment. The People do not challenge these conclusions. Thus, the sole question is whether the evidence derived from the unauthorized cheek swab should be suppressed.

### A. Standard of Review

¶18 When reviewing a lower court's ruling on a suppression motion, this court is presented with mixed issues of law and fact. People v. Martin, 222 P.3d 331, 334 (Colo. 2010). Where sufficient evidence exists in the record to support a trial court's findings of fact, we defer to those findings. People v. Kutlak, 2016 CO 1, ¶ 13, 364 P.3d 199, 203. But the trial court's conclusions of law—i.e., the legal effect of those factual findings—we review de novo. See id.

### B. Exclusionary Rule

¶19 "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands. . . ." United States v. Leon, 468 U.S. 897,

906 (1984). Nonetheless, to effectuate the Fourth Amendment's guarantee against unreasonable searches and seizures, the Supreme Court developed the exclusionary rule. Illinois v. Krull, 480 U.S. 340, 347 (1987) (citing United States v. Calandra, 414 U.S. 338, 348 (1974)). When applicable, the exclusionary rule "forbids the use of improperly obtained evidence at trial," Herring v. United States, 555 U.S. 135, 139 (2009), as well as "evidence later discovered and found to be derivative of an illegality," Utah v. Strieff, __ U.S. __,136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). The rule, which operates as a judicially created remedy, seeks to safeguard Fourth Amendment rights generally through the rule's deterrent effect. Leon, 468 U.S. at 906.

¶20 Recently, this court has used language suggesting that exclusion necessarily follows from an unlawful search. See, e.g., People v. Zuniga, 2016 CO 52, ¶ 14, 372 P.3d 1052, 1057 ("If a warrantless search violates the Fourth Amendment . . . then the remedy is suppression of the evidence obtained."); People v. Ackerman, 2015 CO 27, ¶ 12, 346 P.3d 61, 65 ("If a [search] violates the Fourth Amendment, then its results constitute fruit of the poisonous tree and must be suppressed based on the exclusionary rule.").

¶21 However, "the exclusionary rule should not automatically apply every time a Fourth Amendment violation is found. . . ." People v. Gutierrez, 222 P.3d 925, 941 (Colo. 2009). Because "the exclusionary rule is intended to deter improper police conduct[,]" it "should not be applied in cases where the deterrence purpose is not served, or where the benefits associated with the rule are minimal in comparison to the costs associated with

11

the exclusion of probative evidence." People v. Altman, 960 P.2d 1164, 1168 (Colo. 1998) (internal quotation marks omitted); see also Davis v. United States, 564 U.S. 229, 237 (2011) (noting that the rule's operation is limited to situations in which its deterrent purpose is served); Herring, 555 U.S. at 141 (holding that "the benefits of deterrence must outweigh" the heavy costs of excluding reliable and trustworthy evidence bearing on guilt or innocence).

¶22 Because the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," to warrant its application, law enforcement conduct must be "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 144. The pertinent analysis of deterrence and culpability is objective and does not inquire into an officer's subjective intent. Id. at 145. Rather, the inquiry is "'confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Id. (quoting Leon, 468 U.S. at 922 n.23). Evidence should be suppressed, for example, where "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Krull, 480 U.S. at 348–49 (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

## C. Suppression Is Warranted Here

¶23  The People note that the U.S. Supreme Court has held that suppression is generally inappropriate where the Fourth Amendment violation results not from police misconduct, but instead from an error within the judicial branch.  In Leon, for example, the Court rejected suppression as a remedy where officers acted in reasonable reliance on a search warrant that was issued by a neutral magistrate but was later found to be unsupported by probable cause.  468 U.S. at 900, 913, 922.  The Court reasoned that the exclusionary rule is "designed to deter police misconduct rather than to punish the errors of judges and magistrates."  Id. at 916; see also Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984) (rejecting suppression where search warrant was invalid but "it was the judge, not the police officers, who made the critical mistake").  Similarly, in Arizona v. Evans, 514 U.S. 1, 14 (1995), the Court held that suppression was not warranted where an officer's unlawful seizure stemmed from a mistake by court employees.  There, the officer acted in reliance on an outstanding arrest warrant that in fact had been quashed.  Id. at 4.  The error was traced to the court clerk's office, which had failed to notify the sheriff's office to update its computer records.  Id. at 4–5.  The Court reasoned that exclusion of the evidence seized during the arrest would not deter future mistakes by court employees because unlike police officers, "court clerks are not adjuncts to the law enforcement team" engaged in "ferreting out crime," and "have no stake in the outcome of particular criminal prosecutions."  Id. at 15; see also Krull, 480 U.S. at 350–51; People v. Gall, 30 P.3d 145, 150 (Colo. 2001) ("Because neutral judicial officers have no stake in the outcome of

13

particular criminal proceedings, the threat of exclusion cannot be expected to significantly modify their behavior."). Nor could suppression reasonably be expected to alter the behavior of the arresting officer, who simply relied on the police computer records. Evans, 514 U.S. at 15.

¶24 The People rely on this line of case law to argue that suppression is unwarranted here because the juvenile probation officer who performed the cheek swab is akin to the court employee in Evans for whom suppression would have no appreciable deterrent effect. We disagree for three reasons.

¶25 First, in the cases relied on by the People, the law enforcement official who conducted the search acted in reasonable reliance on information provided by a third party—in those cases, a court official or court employees. That information later proved to be inaccurate, because the third party—not the officer—made a mistake. Suppression served no appreciable deterrent purpose in those cases because the officers who conducted those searches had no reason to question the validity of the warrants under which they acted or otherwise suspect they were not complying with the law. In short, there was "no police illegality and thus nothing to deter." Leon, 468 U.S. at 921. "Penalizing the officer for the [third party]'s error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Leon, 468 U.S. at 921; see also Herring, 555 U.S. at 137–39, 144–45 (rejecting suppression where officer relied on outdated warrant in police records and mistake was attributed to the "nonrecurring and attenuated negligence" of another police employee).

14

¶26    Nothing in the record here, however, suggests the juvenile probation officer who performed Casillas's cheek swab did so in reasonable reliance on misinformation provided by a third party.  Unlike the magistrate in Leon, the court employee in Evans, or even the fellow police employee in Herring—third parties who provided erroneous information to the law enforcement officer who conducted the search—the juvenile probation officer here performed the cheek swab and collected Casillas's DNA himself.  Thus, the error giving rise to the unlawful search and seizure was not attenuated; suppression here would target the officer's own mistake, not someone else's.

¶27    Second, although juvenile probation officers are appointed by the court, see § 19-2-204(1)–(2), C.R.S. (2018), they are much more akin to "adjuncts to the law enforcement team" than judicial officers or court clerk employees, see Krull, 480 U.S. at 348, 350–51; Leon, 468 U.S. at 917.  As noted by Judge Webb in his dissent, juvenile probation officers have broad law enforcement powers.  Casillas, ¶ 43 (Webb, J., dissenting).   Like a law enforcement officer, a juvenile probation officer is considered a "peace officer" under Colorado law.  § 16-2.5-101(1), (3), C.R.S. (2018); § 19-2-926(4), C.R.S. (2018); cf. Minnesota v. Murphy, 465 U.S. 420, 432 (1984) (recognizing that a probation officer "is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers" (internal quotation marks omitted)).  As peace officers, juvenile probation officers have "authority to enforce all laws of the state of Colorado" and may carry firearms while performing their duties.  § 16-2.5-101(1), (2).  Moreover, juvenile probation officers may

15

take juveniles into temporary custody, see § 19-2-502(3), C.R.S. (2018), and may execute arrest warrants, see § 19-2-503, C.R.S. (2018).

¶28 Third, we disagree that the officer here was "performing nothing more than a supervisory function under the direction of the juvenile court." See Casillas, ¶ 38. CODIS exists to allow law enforcement to match DNA found at crime scenes with genetic profiles in the database in order to identify suspected perpetrators of crimes. A cheek swab performed to collect an individual's DNA for entry into the CODIS database therefore serves an inherent law enforcement purpose.

¶29 In their answer brief to this court, the People argue for the first time that suppression is unwarranted because the cheek swab was taken as a result of the juvenile probation officer's reasonable mistake of law. See Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530, 539 (2014) ("[W]e have looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation. . . ."). We disagree. As noted above, however, the People did not invoke the statutory good faith mistake exception under section 16-3-308, either in the trial court or the court of appeals, and thus, this argument is forfeited. Regardless, it fails.

¶30 Heien addressed an officer's misinterpretation of the law as it pertained to whether there was any Fourth Amendment violation at all. 135 S. Ct. at 539 ("Here, . . . the mistake of law relates to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal. If so, there was no violation of the Fourth Amendment in the first place."). In other words, in Heien, the officer's

16

misunderstanding of the law factored into whether the seizure itself was reasonable. But that is not the question before us. Here, a court has concluded that the cheek swab taken by the juvenile probation officer was an unreasonable search under the Fourth Amendment. The People do not challenge that ruling. The only question is whether the exclusionary rule applies.

¶31 Notably, the two cases cited in <u>Heien</u> for the proposition that <u>suppression is not warranted</u> because of an officer's reasonable mistake of law concerned situations where an officer reasonably relied on binding appellate case law that was subsequently overturned, <u>Davis</u>, 564 U.S. at 232 (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"), or an officer enforced an existing statute that was later deemed unconstitutional, <u>Krull</u>, 480 U.S. at 350 (reasoning that suppression would have little deterrent effect where officer "simply fulfilled his responsibility to enforce the statute as written" and statute was later declared unconstitutional). <u>See</u> <u>Heien</u>, __U.S.__, 135 S. Ct. at 539. Neither case concerned the officer's <u>misinterpretation</u> of the law; rather, in both <u>Davis</u> and <u>Krull</u>, the officer followed binding case law or the statute as written. The "mistake" of law in those cases, therefore, was not a question of the officer's interpretation, but rather, the fact that the law on which the officer relied was later deemed invalid—something the officer could not have foreseen. For that reason, suppression was not warranted in those cases.

¶32 Here, by contrast, the People do not contend that the juvenile probation officer reasonably followed the law as written but was mistaken as to its constitutionality.

17

Rather, the People argue that the officer reasonably misinterpreted the law. But the search performed here was not based on any objectively reasonable interpretation of the statute. Cf. Heien, 135 S. Ct. at 539–40 (2014) (noting that although the Fourth Amendment tolerates objectively reasonable mistakes of law, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce"). As recognized by the CBI's CODIS administrator, confirmed by the probation analyst at the State Court Administrator's Office, and conceded by the People below, the cheek swab taken by the juvenile probation officer violated the juvenile DNA collection statute because Casillas was under a deferred adjudication and he was not otherwise required under section 19-2-925.6 to submit a DNA sample. He was never "sentenced to probation"; he was placed under the supervision of the juvenile probation office as a condition of his deferred judgment.

¶33 Importantly, the statutory violation here concerned the propriety of the search itself, directly implicating Casillas's Fourth Amendment rights. See People v. McKinstry, 843 P.2d 18, 20 (Colo. 1993) ("[W]here an officer has obtained evidence in violation of a statute or regulation, the exclusionary rule is not triggered unless the unauthorized conduct also amounts to a constitutional violation."). Moreover, the Colorado Children's Code generally gives heightened protection to juvenile privacy. For instance, the legislative declaration to the Children's Code Records and Information Act, which governs, among other things, access to juvenile delinquency records, recognizes that information obtained through juvenile proceedings "is highly sensitive and has an

18

impact on the privacy of children," and that "[t]he disclosure of sensitive information carries the risk of stigmatizing children." § 19-1-302(1)(a), C.R.S. (2018). Consistent with this declaration, the Children's Code severely limits access to juvenile arrest, criminal, and probation records. See § 19-1-304(2)(b.5)–(c), C.R.S. (2018). In sum, a reasonably well-trained juvenile probation officer—familiar with the provisions of the Children's Code—should have known that the search of Casillas was illegal under the circumstances. See Herring, 555 U.S. at 145; Leon, 468 U.S. at 922 n.23.

¶34 As discussed above, the deterrence benefits of exclusion, and thus the rule's application, depend on the culpability of the law enforcement conduct at issue. Davis, 546 U.S. at 238. When the police act with "deliberate, reckless, or grossly negligent" disregard for Fourth Amendment rights, "or in some circumstances recurring or systemic negligence," Herring, 555 U.S. at 144, then the benefits of exclusion "tend to outweigh the resulting costs," Davis, 564 U.S. at 238 (citing Herring, 555 U.S. at 144). Put differently, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Herring, 555 U.S. at 143 (quoting Krull, 480 U.S. at 348–49).

¶35 Here, the juvenile probation officer who performed the buccal swab "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment." Id. Moreover, the record suggests this was not an isolated incident, given the email from the CBI's CODIS administrator to the probation analyst at

19

the State Court Administrator's Office, acknowledging: "It looks like I have <u>another</u> CODIS hit to an offender with a deferred sentence" (emphasis added).

¶36 Finally, we conclude that suppression would have a deterrent effect. The goal of the exclusionary rule is to "remov[e] inducements to unreasonable invasions of privacy." <u>Leon</u>, 468 U.S. at 900. Indeed, the exclusionary rule "compel[s] respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it." <u>Elkins v. United States</u>, 364 U.S. 206, 217 (1960). Left undisturbed, the court of appeals' decision would have the opposite effect: "[e]xempting evidence illegally obtained by a [juvenile probation] officer from the exclusionary rule would greatly increase the temptation to use the [juvenile probation] officer's broad authority to circumvent the Fourth Amendment." <u>United States v. Payne</u>, 181 F.3d 781, 788 (6th Cir. 1999). Given that law enforcement would benefit from the ability to identify more suspected perpetrators of crimes if the database were more comprehensive, and without the risk that unlawfully obtained evidence would be excluded from future criminal prosecutions, the incentive exists to take DNA from every juvenile whether authorized or not. This is the kind of constitutional hazard that the exclusionary rule was meant to reduce.

### III. Conclusion

¶37 We hold that the exclusionary rule requires suppression of the evidence derived from the juvenile probation officer's unauthorized collection of Casillas's DNA in this case. All the evidence connecting Casillas to the carjacking was derived from the initial

unlawful seizure of his DNA. Without the unauthorized cheek swab, Casillas's DNA would not have been in CODIS, the police would not have obtained a match to Casillas's genetic profile, and the detective could not have prepared the photo array presented to the victim and used to identify Casillas. Accordingly, we reverse and remand with instructions to vacate Casillas's conviction.

**JUSTICE SAMOUR** dissents.
**JUSTICE GABRIEL** does not participate.

21

**JUSTICE SAMOUR**, dissenting.

¶38    Billy Joel aptly recognized in one of his hit songs that "we're only human" and are "allowed to make [our] share of mistakes." Billy Joel, <u>You're Only Human (Second Wind)</u>, <u>on</u> Billy Joel's Greatest Hits (Columbia Rec. 1985). Yet, today, the majority suppresses evidence derived from a search conducted as a result of a juvenile probation officer's mistake of law, without meaningfully analyzing whether the mistake was objectively reasonable. Because the ultimate touchstone of the Fourth Amendment is reasonableness—not perfection—and because the exclusionary rule does not seek to deter objectively reasonable mistakes, I respectfully dissent.

## I.    Introduction

¶39    The majority discusses this case's factual and procedural history in some detail. Maj. op. ¶¶ 7–15. Therefore, I do not repeat it here.

¶40    I agree with the majority that, since the People did not seek review of the court of appeals' conclusion that Casillas's cheek swab violated both the DNA collection statutory provision in question and the Fourth Amendment, the only issue before us is whether application of the exclusionary rule is warranted as a remedy. <u>Id.</u>, ¶ 17. In analyzing this question, I have no qualms with the majority's determinations that juvenile probation officers are more akin to "adjuncts to the law enforcement team" than to judicial officers or court employees, <u>see</u> <u>id.</u>, ¶ 27, and that the juvenile probation officer who collected Casillas's cheek swab did not rely on misinformation provided by a third party, <u>see</u> <u>id.</u>, ¶ 26. Further, like the majority, I cannot side with the court of appeals' determination that suppression of the cheek swab is not justified because the juvenile probation officer

1

was simply performing a supervisory function pursuant to instructions from the juvenile court. Id., ¶ 28.

¶41 Where my colleagues and I part ways is (1) in their implied conclusion that the mistake of law by the juvenile probation officer was not objectively reasonable and, instead, rose to the level of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights or recurring or systemic negligence, see id., ¶¶ 34–35;[1] and (2) in their determination that suppression would have a deterrent effect because, otherwise, "the incentive exists to take DNA from every juvenile whether authorized or not," see id., ¶ 36. These two disagreements are significant because the question of suppression "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Herring v. United States, 555 U.S. 135, 137 (2009). I address each point of contention in turn.

## II. Analysis

### A. The Mistake of Law Was Objectively Reasonable

¶42 In Heien v. North Carolina, __ U.S. __, 135 S. Ct. 530 (2014), the United States Supreme Court addressed whether a traffic stop based on a police officer's mistaken understanding of the law violated the Fourth Amendment. There, an officer pulled over

---

[1] The majority states that the juvenile probation officer "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment" and that the record before us "suggests this was not an isolated incident." Maj. op. ¶ 35.

2

a car after noticing that only one of its brake lights was functional.  Id.  With the defendant's consent, two officers searched the car and found cocaine.  Id.  The defendant was subsequently charged with a cocaine trafficking offense.  Id. at 535.  Before trial, the court denied the defendant's motion to suppress the evidence recovered from the car, rejecting his argument that the stop and search violated the Fourth Amendment.  Id.

¶43     The North Carolina Court of Appeals reversed, holding that the stop was objectively unreasonable and ran afoul of the Fourth Amendment because the vehicle code required only one working brake light.[2]  Id.  On appeal, the prosecution did not challenge the intermediate appellate court's interpretation of the vehicle code; consequently, the North Carolina Supreme Court assumed that Heien's faulty brake light was not a violation of the vehicle code.  Id.  But the North Carolina Supreme Court nevertheless concluded that the stop was valid and consistent with the Fourth Amendment because the officer's mistaken interpretation of the law was reasonable.  Id.

¶44     The United States Supreme Court agreed.   The Court emphasized that "[t]o be reasonable is not to be perfect," and since the Fourth Amendment's "ultimate touchstone . . . is reasonableness," it "allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection."  Id. at 536 (quoting Riley v. California, 573 U.S. __, 135 S. Ct. 2473, 2482 (2014)) (internal quotation

---

[2] The court focused on the code's references to "a stop lamp" and "[t]he stop lamp" in the singular.  Heien, 135 S. Ct. at 535.

3

marks omitted).  The Court added that, just as searches and seizures based on mistakes of fact can be reasonable, so too can searches and seizures based on mistakes of law be reasonable.  Id.

¶45    Under Heien, an officer may be reasonably mistaken on the facts or on the law, but

> [w]hether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law.  There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

Id.  "[T]reating legal and factual errors alike in this context" is nothing new; it is supported by "cases dating back two centuries."  Id. at 536–37.

¶46    Casillas argues that Heien does not apply here because, rather than address the scope of the exclusionary rule, it found that no violation of the Fourth Amendment occurred.  However, the Court in Heien acknowledged that, in previous decisions, it has "looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all."  Id. at 539.  In such cases, the Court has either found or assumed a Fourth Amendment violation, and the evaluation of the reasonableness of an officer's mistake of law has been "limited to the separate matter of remedy."  Id.

¶47    Moreover, Casillas ignores that, since mere negligence by a government official is insufficient to constitute a Fourth Amendment violation, it certainly cannot "meet the more stringent test for triggering the exclusionary rule."  Herring, 555 U.S. at 145.  "To trigger the exclusionary rule" as a remedy for a Fourth Amendment violation, "police

4

conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 144. As the Supreme Court has reiterated, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," not "mistakes [that] are the result of negligence." Id. at 144, 147.

¶48 Like Casillas, the majority glosses over the holding in Heien and strains to distinguish it from this case, noting that "Heien addressed an officer's misinterpretation of the law as it pertained to whether there was any Fourth Amendment violation . . . ." Maj. op. ¶ 30. Put differently, the majority erroneously views Heien as limited to whether a Fourth Amendment violation occurred and having no relevance to whether application of the exclusionary rule is warranted. Id. The majority's overly narrow reading of Heien misconstrues the Supreme Court's analysis. Additionally, it makes no logical sense to apply one standard of "objectively reasonable mistake" to examine Fourth Amendment violations and a completely different standard of "objectively reasonable mistake" to determine application of the exclusionary rule. And, to the extent that a different standard were to be applied, it would have to be more stringent and require conduct that is more egregious in the exclusionary rule context. Herring, 555 U.S. at 144, 147.

¶49 There was no conduct sufficiently deliberate and sufficiently culpable here to trigger the exclusionary rule. Therefore, under United States Supreme Court jurisprudence, including Heien and Herring, the exclusionary rule is inapplicable in this case.

5

¶50    The DNA collection statutory provision in question, § 19-2-925.6, C.R.S. (2018), which addresses the "[g]enetic testing of adjudicated offenders," provides in pertinent part,

> (1) Beginning July 1, 2007, each of the following adjudicated offenders shall submit to and pay for collection and a chemical testing of the offender's biological substance sample to determine the genetic markers thereof, unless the offender has already provided a biological substance sample for such testing pursuant to a statute of this state:
>
> . . . .
>
> (e) Every offender sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult. <u>This paragraph (e) shall not apply to an offender granted a deferred adjudication, unless otherwise required to submit to a sample pursuant to this section</u> or unless the deferred adjudication is revoked and a sentence is imposed. The sample shall be collected:
>
> (I) From an offender committed to the department of human services, by the department during the intake process but in any event within thirty days after the offender is received by the department;
>
> (II) From an offender sentenced to county jail or to community corrections, by the sheriff or by the community corrections program within thirty days after the offender is received into the custody of the county jail or the community corrections facility;
>
> (III) <u>From an offender sentenced to probation, by the judicial department within thirty days after the offender is placed on probation</u>; and
>
> (IV) From an offender who receives any other sentence, by the judicial department within thirty days after the offender is sentenced.

§ 19-2-925.6 (emphases added).

¶51    Under subsection (1)(e), Casillas was not required to submit to collection of a biological substance sample because he was granted a deferred adjudication in 2008 after pleading guilty to an offense that would constitute a felony if committed by an adult.

6

Had he not been granted a deferred adjudication and, instead, been sentenced to probation, he would have been required to provide a biological substance sample. See § 19-2-925.6(1)(e)(III). That he received a deferred adjudication meant that no adjudication entered and no sentence (including to probation) was imposed. But the question before us is not whether the juvenile probation officer violated the statute by collecting Casillas's cheek swab; there is no dispute that he did.[3] The question we are confronted with is whether the juvenile probation officer's mistaken understanding of the statute as requiring Casillas to submit a biological substance sample was objectively reasonable. The answer, in my view, is a resounding "yes."

¶52 The second sentence in subsection (1)(e) and the single sentence in subsection (1)(e)(III) can reasonably be read together as stating that the requirement to submit to collection of a biological substance sample does not apply to an offender who receives a deferred adjudication, "unless" such offender is "sentenced to probation." Id. Of course,

---

[3] The majority asserts that "nothing in the record sheds light on [the juvenile probation officer's] reasons" for collecting a cheek swab from Casillas. Maj. op. ¶ 7. Respectfully, this is something of a red herring. The district court reasonably concluded from the record that Casillas "consented to the taking of the genetic material" as a condition of his supervision. The court of appeals reached the same conclusion. See People v. Casillas, 2015 COA 15, ¶ 2 ("The terms of the deferred adjudication required [Casillas] to be under the supervision of the juvenile probation department," and "Casillas' juvenile probation officer later swabbed Casillas' cheek for a DNA sample."). Furthermore, there is no disagreement that subsection (1)(e) governs the collection—by the judicial department (which includes probation)—of any genetic or biological substance sample from a juvenile offender like Casillas believed, albeit incorrectly, to have been sentenced to probation.

as mentioned, Casillas was not "sentenced" to probation, and could not have been "sentenced" to probation, because he received a deferred adjudication. But the juvenile court ordered him supervised by probation while on his deferred adjudication. And the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication is too nuanced to allow us to fairly conclude that a juvenile probation officer's failure to discern it is a deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights. Because Casillas's deferred adjudication was ordered supervised by probation, it was objectively reasonable for the juvenile probation officer to believe, admittedly mistakenly, that subsection (1)(e) required Casillas to provide a biological substance sample.

¶53 Significantly, the record reflects that the juvenile probation officer was not the only one who misunderstood subsection (1)(e). The district court judge who denied Casillas's motion to suppress, an individual trained in the law who possesses legal experience, appears to have construed subsection (1)(e) as the juvenile probation officer did. The judge believed that Casillas was required to provide a biological substance sample, even though he received a deferred adjudication, because he was "sentenced to probation." In other words, the judge missed the same subtle difference in the statute the juvenile probation officer did between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication. In concluding that the juvenile probation officer did not violate the statute, the judge reasoned that the evidence at the hearing established that Casillas "had been placed on a deferred adjudication with

8

probation,"[4] and that "[s]ubsection (e)(III) indicates that a genetic sample may be taken from an offender sentenced to probation."[5]

¶54     One other judicial officer in this case blurred the difference between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication.  In 2009, the judicial officer presiding over Casillas's underlying juvenile case ordered "_Probation_ and Jurisdiction terminated successfully."  (Emphasis added.) And the probation analyst referenced by the majority likewise mentioned in an email that Casillas had "completed his deferred adjudication" and had been "_released from probation_ in May 2009."  (Emphasis added.)

---

[4] Elsewhere in its written order, the trial court seemed to incorrectly equate the fact that Casillas's deferred adjudication was to be supervised by probation with being "placed on probation."

[5] The majority implies that the district court did not misunderstand the statute or fail to apprehend the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication. Maj. op. ¶ 12.  Instead, asserts the majority, the district court had an insufficient record before it, which caused it to inaccurately believe Casillas had been sentenced to probation.  Id.  The record does not support the majority's perception.  In its written order denying the motion to suppress, the district court expressly noted that Casillas had "entered into a deferred adjudication" and "was also placed on probation."  Later in the same order, the district court reiterated that it "appear[ed] undisputed that [Casillas] had been placed on a deferred adjudication with probation."  Thus, contrary to the majority's characterization, the district court did not rely on a "mistaken factual premise"; rather, the district court mistakenly believed, as did the juvenile probation officer, that Casillas's probation-supervised deferred adjudication meant he was "an offender sentenced to probation" who was subject to the collection requirement in subsection (1)(e).  Id.

9

¶55    The legislature made a similar mistake in 2006 in drafting the predecessor to

section 19-2-925.6, although that statute never became effective.  In the 2006 Session Laws,

the legislature stated:

> (1) Beginning July 1, 2007, the following adjudicated delinquents must submit to and pay for a chemical testing of the person's biological substance sample to determine the genetic markers thereof:
>
> (a) Every person sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult.  This paragraph (a) shall not apply to persons <u>sentenced to probation pursuant to a deferred adjudication</u>, unless otherwise required to submit to a sample in this section, or unless the deferred sentencing is revoked and a sentence is entered.  The sample shall be collected:
>
> . . . .
>
> (III) <u>For sentences to probation</u>, no later than thirty days after the offender is placed on probation.

Ch. 339, § 19-2-925.6, 2006 Colo. Sess. Laws 1687, 1690–91 (emphases added).  Thus, like

the juvenile probation officer, the district court judge who denied Casillas's motion to

suppress, the juvenile court judge who presided over Casillas's underlying case, and the

probation analyst quoted by the majority, the 2006 legislature apparently believed that a

defendant ordered supervised by probation while on a deferred adjudication was a

defendant "<u>sentenced to probation</u> pursuant to a deferred adjudication."  Id. (emphasis

added).

¶56    Although the majority gives <u>Heien</u> short shrift, the Supreme Court's analysis is

instructive in assessing the reasonableness of the juvenile probation officer's error of law.

Notwithstanding its acknowledgement that the North Carolina statute's reference to "<u>a</u>

stop lamp" in the singular suggested that only one working brake light was required, the

10

Court had "little difficulty concluding that the officer's error of law was reasonable." Heien, 135 S. Ct. at 540 (emphasis in original). The Court observed that the statute also provided that "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps," see id. (quoting N.C. Gen. Stat. Ann. § 20-129(g) (2007)) (alteration and emphasis in original), which "suggest[ed] to the everyday reader of English that a 'stop lamp' [was] a type of 'rear lamp,'" see id. (quoting § 20-129(g)). Additionally, a different subsection of the statute, subsection (d), required cars to "have all originally equipped rear lamps or the equivalent in good working order," which, the Court explained, was "arguably" an "indicat[ion] that if a vehicle has multiple 'stop lamp[s],' all must be functional." Id. (quoting § 20-129(d)) (second alteration in original). Given the use of the word "other" in subsection (g), the Court determined that "it would at least have been reasonable to think" that the "rear lamps" referenced in subsection (d) included brake lights. Id.

¶57 The juvenile probation officer's mistaken understanding of subsection (1)(e) was no less reasonable than the officer's mistaken understanding of the "stop lamp" provision addressed in Heien. Just as it was reasonable for the officer in Heien to think that the North Carolina traffic code required two functional brake lights, it was reasonable for the juvenile probation officer to think that subsection (1)(e) required Casillas to submit to the collection of a biological substance sample. Moreover, as was the case with the North Carolina statute in Heien, subsection (1)(e) "had never been previously construed by [the state] appellate courts" when the mistake of law occurred. Id.

11

¶58    There is actually more proof here than in <u>Heien</u> that the challenged mistake of law was reasonable because, as indicated, the juvenile probation officer was not the only one who made it.  Although this is a circumstance the majority disregards, it is relevant to our analysis.  Cf. <u>People v. Glasser</u>, 293 P.3d 68, 72 (Colo. App. 2011).  In <u>Glasser</u>, the defendant urged the trial court to suppress, among other things, the DNA evidence used to identify him because his biological substance sample was collected and uploaded onto CODIS erroneously based on a plea bargain in an earlier case that included an agreement to an illegal sentence.  <u>Id.</u> at 72–73.  As relevant here, the court of appeals refused to apply the exclusionary rule, finding that the mistake by the prosecutor could "hardly be considered flagrant, given that defense counsel approved and the trial court accepted the pleas" in the earlier case.  <u>Id.</u> at 74.  While <u>Glasser</u> preceded <u>Heien</u>, its rationale is consistent with it.

¶59    ~~The majority concludes that the People "forfeited" their argument "that suppression is unwarranted because the cheek swab was taken as a result of the juvenile probation officer's reasonable mistake of law."  See Maj. op. ¶ 29.  In so doing, the~~<u>The</u> majority repeatedly notes that the People failed to assert—before both the district court and the court of appeals—that Casillas's cheek swab was collected due to "a good faith mistake of fact or law."  Maj. op. ¶ 11; <u>see also</u> <u>id.</u>, ¶ 14 (explaining that Judge Webb, in his dissent, observed that the prosecution did not invoke the statutory "good faith mistake" exception under section 16-3-308, C.R.S. (2018))~~.; id., ¶ 29 ("[T]he People did not invoke the statutory good faith mistake exception under section 16-3-308, either in the trial court or the court of appeals, and thus, this argument is forfeited.").~~  This is

12

inherently unfair. We granted Casillas's petition for certiorari in this case to review "[w]hether the court of appeals erred when it concluded that an unreasonable search by a juvenile probation officer does not require the application of the exclusionary rule." Id., ¶ 6 n.1 (emphasis added). I do not understand how we can grant certiorari review on an issue that directly deals with the applicability of the exclusionary rule, and then address the issue on the merits while tying the People's hands by silencing them with respect to a significant aspect of that rule's purview.

¶60 And, regardless of what arguments a party may have previously advanced, Herring makes crystal clear that "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." 555 U.S. at 143 (quoting United States v. Leon, 468 U.S. 897, 911 (1984)); see also Leon, 468 U.S. at 920 (when it is "plainly apparent" that an officer acted reasonably, suppression of the evidence "will not further the ends of the exclusionary rule" because such suppression "can in no way affect his future conduct," except to "make him less willing to do his duty") (internal quotation marks omitted). By law, we must evaluate the flagrancy of the juvenile probation officer's conduct in order to determine whether the exclusionary rule applies. Casillas is asking us to reverse the court of appeals' decision and to apply the exclusionary rule, and we cannot properly address the merits of his request without assessing the reasonableness of the juvenile probation officer's mistake of law. Whether the juvenile probation officer's mistake of law was reasonable is at the heart of this appeal and critical to our decision.

¶61 Rather than meaningfully evaluate the reasonableness of the juvenile probation officer's error of law, the majority appears to conclude, rather summarily, if not circularly, both that "the search performed here was not based on any objectively reasonable interpretation of the statute," see Maj. op. ¶ 32, and that the benefits of exclusion outweigh the costs, see id., ¶¶ 34–35. The majority points out that (1) "the cheek swab taken by the juvenile probation officer violated the juvenile DNA collection statute"; (2) "[i]mportantly, the statutory violation here concerned the propriety of the search itself, directly implicating Casillas's Fourth Amendment rights"; (3) the juvenile probation officer "may properly be charged with knowledge[] that the search was unconstitutional under the Fourth Amendment"; and (4) because the juvenile probation officer "may properly be charged with [such] knowledge[]," "the benefits of exclusion tend to outweigh the costs." Id., ¶¶ 32–35. The first two points, which are undisputed, are irrelevant to whether the juvenile probation officer's mistake was objectively reasonable, and the last two points are conclusory and unaccompanied by any rationale or explanation.

¶62 Despite Herring's mandate, the majority seems satisfied with a standard that generally looks at whether the government official made a mistake and pays little attention to the reasonableness of the mistake. In Heien, Heien and the amici advocated for a similar standard based on "the well-known maxim, 'Ignorance of the law is no excuse,'" and argued "that it is fundamentally unfair to let police officers get away with mistakes of law when the citizenry is accorded no such leeway." 135 S. Ct. at 540. The Court was not persuaded:

> Though this argument has a certain rhetorical appeal, it misconceives the implication of the maxim. The true symmetry is this: Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law. If the law required two working brake lights, Heien could not escape a ticket by claiming he reasonably thought he needed only one; if the law required only one, [the officer] could not issue a valid ticket by claiming he reasonably thought drivers needed two. But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop. And Heien is not appealing a brake-light ticket; he is appealing a cocaine-trafficking conviction as to which there is no asserted mistake of fact or law.

Id. (emphases added).

¶63 The majority also relies on the Colorado Children's Code Records and Information Act ("the Act") to support its decision. Maj. op. ¶ 33. This is a stretch; the Act is unavailing. There is no support for the majority's suggestion that the "heightened protection to juvenile privacy" under the Act leads to heightened protection under the Fourth Amendment or somehow expands the scope of the exclusionary rule. Id. The majority cites the legislative declaration in the Act—which provides that information obtained through juvenile proceedings is highly sensitive and has an impact on the privacy of children, and that its disclosure carries the risk of stigmatizing children—as the premise for its conclusion that the juvenile probation officer "should have known that the search of Casillas was illegal under the circumstances." Id. Respectfully, this conclusion is a non-sequitur. Neither the highly sensitive nature of information acquired through juvenile proceedings nor the risk accompanying the dissemination of such information bears on whether the juvenile probation officer's understanding of subsection (1)(e) was objectively reasonable.

15

¶64    In any event, I believe the majority misses the point. The issue is not whether the juvenile probation officer was "familiar with the provisions of the Children's Code." Id. He was obviously familiar with the provision of the Children's Code addressing the collection of DNA from juvenile offenders who receive a deferred adjudication. Indeed, he collected a cheek swab from Casillas and submitted the sample to be uploaded onto CODIS. The issue is whether the juvenile probation officer's interpretation of subsection (1)(e) was objectively reasonable.

¶65    Finally, the majority implies that this was recurring or systemic negligence because "the record suggests" that the improper collection of a biological substance sample from Casillas "was not an isolated incident." Id., ¶ 35. Again, I disagree. The record is barren of any evidence of recurring or systemic negligence.

¶66    The majority's reliance on a single email, which was sent by the CODIS administrator to the State Court Administrator's Office, is misplaced. That email stated: "It looks like I have another CODIS hit to an offender with a deferred sentence. Would you please check on Ismael Casillas . . . . It looks like he was not eligible, but I need you to confirm that." (Emphasis added.) First, this message establishes that there had been more than one CODIS match to an offender with a deferred sentence, not that there had been more than one CODIS match to an ineligible offender with a deferred sentence. Second, even under the majority's strained interpretation of the message as referring to more than one CODIS match implicating an ineligible offender with a deferred sentence, that could mean two such matches or twenty such matches, and while twenty over a

16

relatively short period may establish "recurring or systemic negligence," two over an unknown period certainly does not.

¶67 In short, under the circumstances present, it was objectively reasonable for the juvenile probation officer to think that Casillas was on probation and, therefore, required to submit to collection of a biological substance sample. Because the juvenile probation officer's mistake of law was objectively reasonable, it cannot be deemed to rise to the level of deliberate, reckless, or grossly negligent disregard of Casillas's Fourth Amendment rights. Further, the record does not support a finding of recurring or systemic negligence. Accordingly, I would conclude that this case falls woefully short of the type of flagrant conduct targeted by the exclusionary rule.

## B. Suppression Would Not Have a Deterrent Effect

¶68 The goal of the exclusionary rule is "to deter improper police conduct"; therefore, the rule should not be applied where the "deterren[t] purpose is not served." People v. Altman, 960 P.2d 1164, 1168 (Colo. 1998) (quoting People v. Deitchman, 695 P.2d 1146, 1160 (Colo. 1985) (Dubofsky, J., concurring)). Moreover, for the exclusionary rule to apply, "the benefits of deterrence must outweigh" the heavy costs of suppressing reliable and trustworthy evidence bearing on guilt or innocence. Herring, 555 U.S. at 141. Stated differently, the deterrence must be "worth the price paid by the justice system." Id. at 144.

¶69 The majority posits that failure to apply the exclusionary rule here would create an "incentive [ ] to take DNA from every juvenile whether authorized or not" because law enforcement "would benefit from the ability to identify more suspected perpetrators

17

of crimes if the database were more comprehensive" and there would be no "risk that unlawfully obtained evidence would be excluded from future criminal prosecutions." Maj. op. ¶ 36. Respectfully, I am unmoved by this sky-will-fall contention. The majority forgets that "[t]he Fourth Amendment tolerates only <u>reasonable</u> mistakes, and those mistakes—whether of fact or of law—must be <u>objectively</u> reasonable." <u>Heien</u>, 135 S. Ct. at 539 (emphases in original). In <u>Heien</u>, the Court rejected Heien's doomsday claim that failure to find a Fourth Amendment violation would "discourage officers from learning the law." <u>Id.</u> The Court explained that the subjective understanding of an officer is irrelevant. <u>Id.</u> Thus, "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." <u>Id.</u> As the majority in this case recognizes, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." Maj. op. ¶ 32 (quoting <u>Heien</u>, 135 S. Ct. at 539–40).

¶70   In any case, if the majority were to determine that the exclusionary rule is inapplicable here, a probation officer in the future would have a difficult, if not impossible, time convincing us that his mistake in collecting a biological substance sample from an ineligible deferred adjudication offender is objectively reasonable. This is so because there would then be precedent clarifying that a juvenile offender on a deferred adjudication for what would constitute a felony if committed by an adult is not required to submit to a biological substance sample under subsection (1)(e) simply because he is ordered supervised by probation.

¶71 Contrary to the majority's ruling, there is no basis in the record to find that application of the exclusionary rule serves the purpose of deterring improper conduct here. To be sure, the juvenile probation officer in this case made a mistake of law. But the mistake was objectively reasonable. Consequently, there is no flagrant conduct to be deterred here. Nor will the benefits of deterrence, if any, outweigh the heavy costs of exclusion to the justice system.

### III.   Conclusion

¶72 In sum, I respectfully disagree with the majority's decision to apply the exclusionary rule in this case. Instead, I would affirm the judgment of the court of appeals on the grounds I have articulated.